United States District Court
Southern District of Texas
**ENTERED**
September 02, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SYEDA S. ALAM, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-19-2840 |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 10), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 13), Defendant's Motion for Summary Judgment (Document No. 11), and Plaintiff's Response to Defendant's Motion for Summary Judgment  (Document No. 14).  After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on October 23, 2019.  (Document No.9).

## I. Introduction

Plaintiff, Syeda A. Alam ("Alam")  brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability benefits ("DIB"). Alam  argues that the Administrative Law Judge ("ALJ") committed errors of law when she found that Alam was not disabled. Alam argues that new evidence, received after the ALJ hearing, would have materially changed the outcome of the hearing had it been presented to  the ALJ, Jessica Hodgson.  Alam further argues that the ALJ erred in formulating her residual functional capacity ("RFC"). Alam seeks an order reversing the ALJ's decision,  and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Alam was not disabled, that the decision comports with applicable law, and that the decision  should, therefore, be affirmed.

## II. Administrative Proceedings

On September 3, 2015, Alam filed for DIB claiming she has been disabled since December 31, 2001, due to a twisted right artery, right sided weakness, a herniated disc, high blood pressure, an adrenal gland cyst, cysts in kidney, and cysts in neck.  (Tr. 195-200).  The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 128-134).  Alam then requested a hearing before an ALJ.  (Tr. 135-136).  The Social Security Administration granted her request, and the ALJ held a hearing on July 19, 2018. (Tr. 40-94).   On October 31, 2018, the ALJ issued her decision finding Alam not disabled.  (Tr.12-39).

Alam sought review by the Appeals Council of the ALJ's adverse decision. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are

present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Alam's contentions in light of the applicable regulations and evidence, the Appeals Council, on July 9, 2019, concluded that there was no basis upon which to grant Alam's request for review. (Tr.1-6). The ALJ's findings and decision thus became final.

Alam has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 11). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 10). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through1792. (Document No.5). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine

3

the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

4

42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If  the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.[2]

In the instant action, the ALJ determined, in her October 31, 2018, decision that Alam was not disabled at step five. In particular, the ALJ determined that Alam last met the insured status requirements of the Act on December 31, 2006, and that she had not engaged in substantial gainful activity since December 31, 2001, the alleged onset date (step one); that Alam's multilevel spondylosis and mild dextroscoliosis, lumbar radiculopathy, chronic vertigo and sciatica, mild concentric left ventricular hypertrophy, trace mitral valve regurgitation, trace tricuspid valve regurgitation, insomnia, cervical radiculopathy, degenerative disc disease of the cervical spine with spurring at T1 and mild facet joint arthropathy at C7-T1, intervertebral disc disorder of the lumbar region with myelopathy, mild lower lumbar spondylosis, diffuse disc bulging at L4-5 and disc bulging at L5-S1, migraine headaches, mild narrowing of the central canal at L5-S1 and L4-5, and arachnoid granulation of the brain were severe impairments and that Alam's hypertension and hyperlipidemia, inflammatory polyarthropathy, asthma, diarrhea, right renal cyst, fatty liver,

---

[2] Several of the Social Security Rulings ("SSRs") governing social security cases were amended or rescinded in 2016 and 2017. *See, e.g.,* 81 Fed. Reg. 66138-01, 2016 WL 5341732 (F.R. Sept. 26, 2016); 82 Fed. Reg. 5844-01, 2017 WL 168819 (F.R. Jan. 18, 2017). Depending on the regulation, the new rules apply to claims filed either on or after January 17, 2017, or March 27, 2017. The regulations provide, in pertinent part, that "[w]e expect that Federal Courts will review our final decisions using the rules that were in effect at the time we issued the decisions.". Because Alam filed her application for DIB prior to January 17, 2017, the Court will cite to the old rules that are applicable to claims filed prior to 2017.

osteoarthritis of the right knee, small plantar calcaneal spur, subtherapeutic level of carbamazepine and hallux valgus were not severe (step two). The ALJ further found that the following complaints were not medically determinable impairments: dizziness, paresthesias of the skin in September 2017, right flank pain, shoulder pain and gastroesophageal reflux disease, near syncope and palpitations, edema of the lower extremities, probable generalized tonic-clonic seizures, painful gait, joint pain, and foreign body in the foot; that Alam does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in Appendix 1 of the regulations (step three); that Alam has the RFC to perform light work with the following limitations:

> the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, sitting for six hours in an eight hour workday, alternating to standing for five minutes after every 30 minutes of sitting, standing for six hours in an eight hour workday, alternating to sitting for five minutes after every 30 minutes of standing; walking for six hours, alternating to sitting for five minutes after every 30 minutes of walking. She can push and pull as much as she can lift and carry. She can climb ramps and stairs occasionally, secondary to dizziness. She can never climb ropes, ladders or scaffolds. The claimant can balance occasionally and stoop frequently secondary to dizziness, and frequently kneel, crouch, and crawl. Environmentally, the claimant can work at unprotected heights occasionally and never around moving mechanical parts, avoiding open bodies of water. She is unable to swim or use sharp knives, taking the usual seizure precautions. She is able to understand, remember, and carry out instructions. The claimant is able to perform simple routine tasks; use judgment; and is able to perform simple work-related decisions. She is able to perform less than light work, except for frequently reaching overhead to the right due to rotator cuff issues and for all other reaching, she can reach frequently to the right. She can handle items frequently with the right hand. (Tr. 28-29).

The ALJ further found that Alam had no past relevant work (step four); and that based on Alam's RFC, age (41), education (high school), and ability to communicate in English, and the testimony of a vocational expert, that Alam could perform work as a photocopy machine operator, a laundry classifier, and a cashier, and that Alam was not disabled within the meaning of the Act (step five).

As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that a month before Alam alleges she became disabled, she was treated on November 8, 2001, at Memorial Hermann Southwest Hospital. (Tr. 99-101). Alam complained of weakness in her left hand for the past week, and numbness in her left lower extremity. She reported having hypertension for eight years and benign paroxysmal positional vertigo. Neurologically, Alam had good strength through out her extremities. Her left hand was slightly weaker than the right hand. No sensory deficits were noted. Diagnostic imaging from November 9, 2001, revealed that the results of a CT of the head, MRA of the carotid arteries, MRI of the brain, were all unremarkable. A MRA of the Circle of Willis was "moderately suspicious for a narrowing of the internal carotid within the petrous bone on the right", and a cerebral angiogram revealed "critical stenosis of the right internal carotid artery just proximal to the origin of the right opthalmic artery." (Tr. 304, 737, 738, 996, 997). She was seen by Shahin Shirzadi, M.D., a neurologist, a few weeks later. Neurologically, Alam was intact. She had decreased pinprick sensation over the left arm and leg. Her motor strength was 5/5 in the bilateral upper and lower extremities with the exception of the right deltoid, which showed some weakness. (Tr. 96-97).

8

Medical records from 2002 reveal that the results of a MRA of the carotid arteries taken on July 2, 2002, was within normal limits.  (Tr. 374).

Medical records from 2003 reveal that Alam had a routine blood pressure follow up appointment on March 3, 2003, with Dr. D'Souza, her treating physician.   (Tr. 349). She saw Dr. D'Souza again on March 19, 2003, for a cyst on her right upper thigh (Tr. 346).  Because Alam had an abnormal breast mammogram and ultrasound, she had a biopsy of her left breast on June 14, 2003, which revealed no malignancy.  (Tr. 284-287, 316, 345).  Blood work taken on September 22, 2003, and on October 7, 2003, revealed that Alam had very low potassium.  (Tr. 354, 356).  Alam went to the emergency room at Memorial Hermann Southwest Hospital on November 14, 2003, complaining of abdominal pain.  A CT of the abdomen revealed "mild nonspecific stranding of the fat adjacent to the pancreatic tail.  Mild changes of pancreatitis cannot be excluded. . . otherwise unremarkable."  (Tr. 459).

Medical records from 2004 reveal that an ultrasound of the left breast revealed a small solid cyst and nodule.  (Tr. 282, 283).  Lab results dated April 23, 2004 revealed that Alam's glucose and cholesterol were high.  (Tr. 348).  Alam underwent a guided right breast biopsy on June 30, 2004. (Tr. 300, 375-377).   The procedure was stopped by Dr. Steven Thomas when Alam reported dizziness, and appeared to have a seizure.  Dr. Thomas wrote:  "during the procedure the patient appeared to be involuntary clenching of her hands, was somewhat incoherent and the procedure was stopped at this time after two biopsies.  The patient immediately was taken out of the sterotactic machine, was laid down but continued to have this involuntary motion of upper and lower extremities, was incoherent with a blood pressure of 240/190.  At this point although the patient was conscious but was somewhat incoherent with a normal rhythm" and that  Alam's husband "claims

9

that she has multiple of these episodes." (Tr. 301-302).  A second attempt at a breast biopsy was undertaken on July 7, 2004.  (Tr. 290, 365-366).  Again, the procedure was stopped when Alam became dizzy sitting up, and appeared to began to have what appeared to be clonic-tonic-type motion with the hand contracting.  A chest x-ray taken on July 26, 2004, revealed mild increased interstitial markings.  (Tr. 299, 369, 372).  Alam was treated for low potassium and weakness on August 10, 2004.  (Tr. 294-295).  In August, Alam, under general anesthesia, had a breast biopsy. The results showed no evidence of carcinoma.  (Tr. 292-293).  On August 4, 2004, Alam had nerve conduction studies.  The tests revealed that Alam had normal motor and sensory latencies, amplitudes, and velocities and normal electromyogram of the upper and lower extremities and there was no evidence of myopathy, radiculopathy, or neuropathy.  (Tr. 323-325).  Because Alam complained of neck pain, on August 17, 2004, she had an MRI of the neck.  The MRI revealed multiple nonspecific small to moderate sized lymph nodes in the right and left side of the neck with nonspecific abnormal bone marrow signal intensity involving the T2 vertebral body and mild maxillary sinusitis.  No other abnormality was noted.  (Tr. 370-371). A bone scan taken on September 2, 2004 revealed minimal degenerative changes.

Blood work taken on January 3, 2005, and on May 6, 2005, showed that Alam's seizure medication (carbamazepine) was in range.  (Tr. 342, 343).  A CT scan of the abdomen was negative.  (Tr. 361).  A CT of the neck and chest that was taken on April 13, 2005, revealed no abnormalities.  (Tr. 312, 317, 318, 337, 338).  The records show that on March 14, 2005, Dr. Thomas wrote that Alam's recent mammogram was unremarkable, her breast exam was unremarkable, and both the CT scan of the neck and chest showed no evidence of obvious adenopathy or masses.  (Tr. 336).  Alam's treating neurologist, Dr. Shahin Shirzadi, in a letter dated May 6, 2005, stated that Alam complained

of intermittent episodes of twitches over the left arm, episodes of laughing inappropriately, and having no recollection of doing this. Dr. Shirzadi wrote that clinically, Alam was alert and oriented, able to name objects and repeat phrases, had clear speech, her cranial nerves were intact, she had no weakness and no ataxia. Based on the examination, Alam was continued on Carbatrol for seizures. Blood work revealed that Alam's seizure medication was within therapeutic range on May 17, 2005. (Tr. 339). An MRA of the Circle of Willis showed "stenoses of the proximal right middle artery bifurcation branch which are estimated to be moderate in degree and stenosis, probably mild, in the distal right cavernous internal carotid artery. Conventional angiography would be more sensitive in assessing the degree of stenosis and in determining interval change from the previously reported marked stenosis in the right internal carotid artery in an angiography report dated 11/9/01. (Tr. 341).

Dr. D'Souza referred Alam to Earl L. Mangin, M.D., a cardiologist. The results of an echocardiogram revealed normal left ventricular systolic function, abnormal left ventricular diastolic dysfunction and mild regurgitation. (Tr. 357-358). Dr. Mangin's June 5, 2005, office visit note reveals that Alam was ambulating with a cane. She was neurologically intact and no abnormalities were noted in the extremities. Based on the results of the echocardiogram, EKG, and physical exam, Dr. Mangin opined:

> Assessment: This patient with atypical chest discomfort. Given her normal adenosine Cardiolite stress test likelihood of significant underlying coronary disease is small. Further likelihood that the patient would have a myocardial infarction next year based on statics is less than 1%. I have elected to increase her blood pressure medications for better control, and I have simply increased the dose of Lotrel 10/20 mg and asked her to followup in the near future. I do think that perhaps the GI workup may be indicated in light of her other history, and she is currently on medications as well.

(Tr. 383-384). A month later, on July 18, 2005, Alam went to the emergency room at Memorial

Hermann Southwest Hospital complaining of body pain for ten days. (Tr. 460, 462-474). The records indicate that "immediately prior to triage patient had a 'seizure' in the waiting room.  Reported her body goes into spasms. . . pt able to follow commands and speak while seizure was happening." (Tr. 472-473).  Alam was diagnosed with myalgias/arthralgia and discharged home in stable condition.

Alam had a neurology appointment with Dr. Shirzadi on August 1, 2005.  (Tr. 475-478). The examination results were unremarkable.  Alam's motor strength was 5/5, bilaterally in the upper and lower extremities.  In addition, a CT of the head was unremarkable.  Based on the clinical findings, and the CT results, Dr. Shirzadi opined that the etiology of the headaches was unclear but TMJ was suspected. (Tr. 478).  Alam went to the emergency room at Memorial Hermann Southwest Hospital on August 1, 2005, complaining of a headache.  Alam was tender over the right trapezious muscle and was depressed.  No other abnormalities were noted in her physical examination.  A CT of the head negative.  She was diagnosed with myofascial strain acute, instructed to take ibuprofen and discharged in stable condition.  (Tr. 480-501).  Alam returned to the emergency room at Memorial Hermann Southwest Hospital on August 25, 2005, this time complaining of right arm pain from her shoulder to waist, and breast pain. According to the treatment note, Alam's grip was weak on the right.  An x-ray of the chest was normal.  Blood work revealed low potassium.  (Tr. 503-521).

Alam underwent a consultative neurological evaluation by Dr. Ronald De Vere, on December 13, 2005. (Tr. 385-386).  Alam reported that she had a stroke that involved her left arm and leg and that she had active seizures on that side.  Alam used a cane to ambulate.  Blood work revealed that the seizure medication was within normal range.  The results of the physical examination reveal that Alam's blood pressure was elevated, 211/133.  Dr. De Vere wrote:

Neurological: Cognitive testing reveals her to have normal cerebellar and cognitive

function. Cranial nerves seem to be normal. Her right upper and right lower strength are normal. Reflexes on the left side are 3+, 2+ on the right. She has mild weakness of the left arm and leg at 4/5. Diminished rapid alternating movements of the left hand and left leg. Normal position, pin, and touch in both arms and legs. Plantar response, extensor on the left, flexor on the right. She requires a cane to ambulate. She has a mild circumduction gait. She cannot walk on her heels and toes, tandem walk, or hop or jump. She has diminished ability to coordinate the left hand and hold and carry things on the left, as she can on the right.

Laboratory Results: Review of her medical records, there is a carotid arteriogram and vertebral arteriogram done on 11/09/01 and the diagnosis was critical stenosis of the right internal carotid artery, proximal to the origin of the right opthalmic artery. MRI of the brain at that time was normal. MRA of the brain showed narrowing of the internal carotid artery in the right petrous bone. CT of the head at that time was normal. On 05/13/05, she had another MRI of the brain, which is the mostly the Circle of Willis. It showed mild-to-moderate stenosis and the proximal bifurcation of the right middle cerebral artery, also decreased caliber and the right internal carotid artery at the origin of the ophthalmic. Further angiogram would be indicated for further definition of the stenosis. No aneurysms were seen. There is a note from Dr. Earl Mangin. He is a cardiologist, saw the patient on 06/15/05. She complained of some chest discomfort. He felt she had atypical chest pain and she had a normal Cardiolite stress test, which made it less likely she had coronary artery disease. He increased her blood pressure medicine to Lotrel 10/20 mg.

Clinical Impression:

Diagnosis: It is my opinion that this patient has cerebrovascular disease in the distribution of the right carotid and middle cerebral artery, and she does have evidence of mild cerebral deficit and appears to be having focal seizures, which are under poor control. These are all secondary to likely the intracranial internal carotid artery stenosis.

Discussion: Based on current evidence, it is my opinion that she could sit, stand, and move about, although she does need a cane. She can lift, carry, and handle objects with the right side, but not the left. Her hearing and speaking are normal. She cannot heel and toe walk, squat, hop, or tandem walk. She has a mild circumduction gait. Her seizures are major and minor, and they occur three or four times a month, and they are occurring despite her medication. She is taking her medication. The doses of her medication should be increased further, and probably a different anticonvulsant such as Keppra or Lamictal should be given to her instead of Neurontin for her focal seizures.

Records from 2006 reveal that a state disability determination unit physician Scott Spoor

13

completed a Physical Residual Functional Capacity Assessment on January 9, 2006. (Tr. 392-399).

Dr. Spoor disagreed with Dr. DeVere's evaluation, namely, that Alam had mild weakness and gait

problems, including use of a cane.   Based on his review of the records, Alam's seizures were

"sudden spells of spasm or distortion of left arm/leg, sometimes with syncope.  Listing level

frequency not documented. Dr. Spoor opined that Alam could perform light work.  Specifically,

Alam could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds/ stand

and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; sit about

6 hours in an 8- hour work day; and had no push/pull limitations.   Alam could  never climb

ladders/ropes/scaffolds; she could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and

crawl.  Her manipulative limitations included limited handling and fingering but she could reach all

directions (including overhead).   Alam had no visual or communicative limitations.   She had no

environmental limitations except for hazards, which she should avoid even under moderate exposure.

On January 25, 2006, Alam sought medical attention for right side of head pain and blurred

vision in the left eye at Memorial Hermann Southwest Hospital.  She ambulated with a cane when

she arrived at the emergency room.  A CT scan of head was negative.  Alam was diagnosed with

transient ischemeic attack and was discharged in stable condition.  (Tr. 543-554).  Alam returned

to the emergency room at Memorial Hermann Southwest Hospital on June 25, 2006.   She

complained of abdominal pain.  (Tr. 556-571).

Treatment records from 2007 show that Alam had a CT of the chest and pelvis on June 6,

2007.  No adenopathy was noted.  (Tr. 582-598).

Because Alam complained of supra clavicular pain, Dr. Thakkar ordered a CT of the neck,

chest and abdomen.  Alam had the tests on April 28, 2008.  The CT of the neck showed a possible

14

7 mm parotid mass.  The CT of the chest/abdomen/pelvis was stable and showed no significant changes from an image taken on June 6, 2007.  (Tr. 702-708).  A chest x-ray taken on October 10, 2008, was normal.  (Tr. 709-710).

In 2009, Alam had bilateral breast mammogram and ultrasound at the Memorial Hermann Southwest Breast Center on January 26, 2009. (Tr. 732-736).

Medical Records from 2010 show that Alam had a bilateral breast ultrasound and mammogram, the results of which were benign, and there was nothing to correspond to Alam's complaints of pain.  (Tr. 590-594).  A CT of the abdomen revealed a "stable indetermiante small left adrenal gland nodule with findings not typical of adenoma, probable right renal cysts, mild constiptation, an enlarged right ovary, mild cardiomegaly, and stable indeterminate non-calcified subcentimeter pulmonary nodules in the left lung base.  (Tr. 595-598).  Alam had a CT of the neck on May 11, 2008, which revealed no abnormality at the site of the soft tissue marker, scattered sub-centimeter lymph nodes that were unchanged from a April 28, 2008 CT scan, and mild chronic sinusitis.  (Tr. 599-601).  Alam underwent a vascular examination by Dr. Robert McKowen.  He opined that there was no evidence of deep venous thrombosis or superficial venous thrombosis in the left lower extremity.  (Tr. 602).

Records from 2011 reveal that Alam had an electroencephalogram. (Tr. 402).  The results revealed a "normal awake and sleep EEG. There was no epileptiform activities noted in study. An x-ray of the left knee revealed minimal tricompartmental osteoarthritis.  (Tr. 715).  An x-ray of the right knee revealed minimal osteoarthritis.  (Tr. 716).  An x-ray of the left ankle revealed a small plantar calcaneal spur.  (Tr. 717).

Records from 2012 show that Alam went to St. Luke's Sugar Land Hospital emergency room

on February 12, 2012.  (Tr. 849-868).  Alam complained of knee pain and left elbow pain, following

a cortisone shot earlier that day in the left knee and left elbow.  She was hypertensive.  St. Luke's

contacted Dr. Thakkar, who confirmed he had given the injection earlier and that Alam had reported

that her knee felt better following the injection.

Alam had an office visit with Dr. Thakkar on June 10, 2012, during which she experienced

chest pain and left-sided weakness and pain, and as a result was transported to Memorial Hermann

Southwest Hospital. (Tr. 1621-1666).  When admitted, Alam's blood pressure was fluctuating.(Tr.

426).  A nuclear stress test was normal.  (Tr. 428-429).  An ultrasound of the kidneys revealed a

small right cortical cyst.  (Tr. 430-31).  A CT of the head and neck was negative.  (Tr. 435-437).  An

MRI of the brain revealed "scatttered foci of abnormal signal in the subcortical white matter of both

cerebral hemispheres."  (Tr 438-439).  A MRI of the lumbar spine showed:

> 1.  Mild lower lumbar spondylosis and facet arthrosis greatest at L4-L5 and L5-S1
> similar to the prior examination.
>
> 2.  Mild diffuse disc bulge at L4-L5 with a stable broad-based left lateral disc
> protrusion cuasing stable mild spinal canal narrowing, stable mild left neural
> foraminal narrowing, and minimal right neural foraminal narrowing.  Mild mass
> effect appears to be present upon the exiting left L4 nerve root related to the left
> lateral disc protrusion at this level.
>
> 3.  Mild diffuse disc bulge at L5-S1 with increasing left paracentral asymmetry and
> annular fissure causing mildly increasing thecal sac compression, moderate
> narrowing of the subarticular portion of the left neural foramen, and mild to moderate
> narrowing of the subarticular portion of the right neural foramen.
>
> 4.  Small indeterminate left adrenal gland nodule.

Several specialists were consulted.  Dr. Mahoney, a cardiologist, noted that Alam's cardiac enzymes

were negative as was the EKG.  Myocardial perfusion imaging revealed "normal perfusion at stress

and at rest, normal wall motion, ejection fraction of 61%, volumes 58 mm and systolic volume was

23 mm.  Negative myocardial perfusion imaging and stress tests."  Based on these results, Dr.

Mahoney opined it was not Alam's heart.  Because of Alam's hypertension, Dr. Premal Joshi, a

nephrologist did a consultative examination.  (Tr. 410-412).  Dr. Joshi opined that the "etiology of

malignant hypertension, unclear.  It is quite possible this is essential hypertension. . . Other

possibility is rebound hypertension."  Dr. Joshi recommended that Alam take two different

hypertensive medications.  Alam also had a neurology consultation with Dr. Andrew D. Barreto.  (Tr.

413-415).  Alam reported an eighteen year history of positional vertigo, multiple times a day, sitting

and standing, that resolved on its own after a few minutes.  Alam described her recent episodes as

a "new kind of vertigo ...with moving head up and down and side to side."  Neurologically, Alam

had a negative Dix-Halpike maneuver.  Her right and left upper extremities were 5/5 as were the

right and left lower extremities.  Based on the examination results, Dr. Barreto opined that Alam had

"positional vertigo.  I have reassured her that she does not have a right a right internal carotid artery

stenosis."  (Tr. 414).  Dr. Thakkar's discharge diagnosis states:

> After the admission, she underwent extensive workup which includes MRI of the
> brain without contrast, echocardiogram and nuclear stress test, MRI of the lumbar
> sacral spine, renal ultrasound and Doppler of the renal arteries and CT angiogram of
> the head and neck.  The patient's workup revealed no evidence of any acute ischemic
> or hemmorrhagic infarct (negative).  Patient was found to have negative stress test
> and normal echocardiogram with ejection fraction 70%.  Patient presented to have
> moderate concentric left ventricular hypertrophy but overall valvular exam was
> normal.  The lumbosacral spine MRI revealed mild diffuse disk bulging at L4-L5
> level with stable, broad based left lateral disk protrusion causing stable mild spinal
> canal narrowing.  There was also mass effect of the left L4 nerve root.  There was
> also mild diffuse disk bulge at L5-S1.  A small, indeterminate hyperechoic focus in
> the cortex of the lower pole of the left kidney.  No evidence of significant renal artery
> stenosis, nonspecific elevation of resistive indices of the arteries on the right.  CT
> angiogram of the head revealed internal carotid arteries.  Both carotid artery siphons
> were mildly tortuous with minimal atherosclerosis without significant stenosis or
> focal aneurysm.  Normal middle cerebral as well as anterior cerebral arteries, normal
> vertebrobasilar system.  Overall, it was unremarkable.  The patient had an episode

17

of seizure for which Carbatrol dose was increased to 600 mg q. 12h, but patient could not tolerate the dose and it was reduced back to 300 mg p.o. q. 12h. Patient's home medications were adjusted by Dr. Joshi. The patient was taken off the clonidine. She was started on clonidine patch. As patient was also treated with Antivert, diazepam and Xanax, patient became quite drowsy, sleepy with hypotension, bradyarrhythmia, so her medication was readjusted. The patient's diazepam was changed to p.r.m. Xanax was reduced to 0.125 mg p.o. b.i.d., Antivert also was changed to half tablet p.o. q. 8 and was taken off which was started after stopping clonidine tablets. The patient was also treated with Norvasc followed by losartan and minoxidil. Blood pressure control was significantly improved. Consult requested with psychiatrist but no psychiatrist was available at the present time so she was advised to follow with psych as outpatient. She was discharged home in stable condition after the evaluation and treatment with physical therapy during hospital stay with care and management per home health nursing. Patient was discharged home in stable condition.

Alam had follow up appointments with Dr. Thakkar on October 8 (Tr. 957-961, 1097-1100); October 19, 2012 (Tr. 953-957, 1093); and November 30, 2012 (Tr. 1089-1097). At each visit, Alam's primary complaints related to sneezing, sinus congestion, and cough. She ambulated normally and had normal neurological and musculoskeletal examinations.

Medical records from 2013 reveal that Alam was seen by Dr. Thakkar on January 11, 2013, for refills. She was ambulating with a cane. Her examination results were normal. (Tr. 944-948, 1084-1088). The following month, on February 11, 2013, returned. She ambulated with a cane. Alam denied any physical complaints. Musculoskeletal examination results showed normal movement of all extremities and paralumbar stiffness and tenderness. She had normal gait and station. Dr. Thakkar prescribed Celebrex for back pain and sciatica.

Alam had an appointment with Dr. Thakkar on February 25, 2013, for a cough, sinus congestion and ear stuffiness. She was ambulating normally and overall, all examination results were normal. (Tr. 948-953). Alam continued to complain of pain at her April 11, 2013, office visit with Dr. Thakkar. (Tr. 935-938, 1076-1080). She was ambulating with a cane and had weakness

in the left leg.  Results of the musculoskeletal examination revealed abnormal motor strength (right upper arm, shoulder), tenderness muscles right shoulder.  She was neurologically intact.  She was seen at the Memorial Herman Southwest emergency room on May 12, 2013.  (Tr. 607-614, 1667-1679).  Alam complained of a headache and generalized weakness.  Her blood pressure was elevated, 209/96.  A CT of the head revealed no acute intracranial abnormality.  (Tr. 609, 613).  A chest x-ray was normal.  (Tr. 609, 614).  Alam was discharged as stable.

Alam had an office visit with Dr. Thakkar on August 19, 2013, for neck pain.  The results of the neurological and musculoskeletal examination were normal.  (Tr. 930-933, 1070-1075).  A month later, on September 16, 2013, Alam complained of pain in the right hip.  Dr. Thakkar's treatment note shows that Alam ambulated with a cane.  Alam had a limited range of motion and left sacroilliac joint tenderness.  Based on this examination, Dr. Thakkar diagnosed sprain of sacroiliac ligament.  Alam had an office visit with Dr. Thakkar on October 8, 2013.  She complained of feeling sick after receiving a flu shot.  She reported dizziness and headaches.  (Tr. 916-920, 1056-1061).  Alam was neurologically intact. No abnormalities were noted in her musculoskeletal examination.  She was diagnosed with a common cold.

Medical records from 2014 reveal that Alam sought treatment for right upper quadrant pain that radiated to her back at Methodist Sugar Land Hospital Emergency Room on January 13, 2014.  According to the admitting treating note, she arrived by private car and was ambulatory.  (Tr. 1517-1567).  Alam was neurologically intact and she had no problems with gait.  She was diagnosed with biliary colic and discharged.  An MRI of the thoracic spine revealed multilevel spondylosis but no significant or foraminal stenosis, no soft disc herniation and mild dextroscoliosis.  (Tr. 998-999).  Dr. Thakkar discussed the MRI results with Alam on February 26, 2014.  The office note indicates

19

that she was ambulating normally. Dr. Thakkar noted that she had tenderness over left paracervical and upper thoracic stiffness and tenderness. (Tr. 977-981).

Alam experienced right mid-lumbar spine and right flank pain on May 7, 2014, and sought care at Memorial Hermann Southwest Hospital. (Tr. 620-627, 1685-1696). A CT of the abdomen was negative. Treatment records reflect that Alam was given potassium and discharged. Following her visit to the ER, Alam had a follow up appointment with Dr. Thakkar on May 20, 2014. Alam was ambulating with a cane. The examination note indicates that Alam had neck pain with motion and was tender. Her neurological and musculoskeletal examination results were normal. (Tr. 971-977).

Alam returned to the Emergency Room on August 20, 2014. (Tr. 631-640, 1699-1714). She complained of headache and neck pain. Alam's blood pressure was 223/112. Neurologically she was intact, and her EKG was normal. A CT of the head was stable without acute intracranial process detected. (Tr. 639). Alam's headache resolved, her blood pressure went down and she wad discharged home. The following day, Alam had an office visit with Dr. Thakkar. The treatment note shows that she ambulated with a cane. Her neck was tender and there was muscle rigidity on the left. She had limited range of motion in the left lower extremity. (Tr. 782-788, 966-971). Alam underwent testing of the autonomic nervous system on September 11, 2014. The results were generally normal. One of the two resting autonomic parameters (parasympathetic or sympathetic activity) suggested possible advanced autonomic dysfunction. (Tr. 1258-1265). Alam had her annual physical with Dr. Thakkar on September 11 too. She was ambulating with a cane. Dr. Thakkar noted that Alam was neurologically intact. She had tenderness in the left lateral hip and knee and right upper inner thigh with palpable varicose veins. (Tr. 775-782, 1249-1255). At Alam's next

office visit on October 6, 2014, with Dr. Thakkar she complained of nasal and sinus congestion and headaches.  The office note reveals that she was ambulating normally, had normal tone and motor strength and normal movement of all extremities.  Likewise, she had normal gait and station and normal sensation.  (Tr. 770-775, 1244-1249).  Alam had an office visit with Dr. Thakkar on October 22, 2014, for a sinus infection.  According to the treatment note, Alam ambulated with a cane.  Examination results showed muscle rigidity on the left side of the neck, a limited range of motion and tenderness in the left hip but was otherwise normal.  Her gait and station was wide-based and waddling.  (Tr. 765-769, 1241-1243).                On October 24, 2014, Alam was transported by ambulance to Memorial Hermann Southwest Hospital.  (Tr. 643-652, 1715-1736).  She complained of feeling faint and weak after taking a new hypertensive medication.  Alam's blood pressure was 149/75.  Blood work revealed normal cardiac enzymes and blood chemistry except for potassium and albumin.  She was given potassium and discharged.  Alam had a follow up appointment with Dr. Thakkar on November 5, 2014.  She was ambulating normally.  Examination results revealed neck pain with motion and tenderness over the right sternoclavicular muscle.  No abnormalities were noted in her neurological and musculoskeletal examination.  Dr. Thakkar diagnosed Alam with neck pain.  (Tr. 759-765, 1234-1239).

On February 23, 2015, Alam had an appointment with Dr. Thakkar.  She complained of right side neck pain and left side thigh pain.  The treatment note shows she ambulated with a cane.  Alam had a limited range of motion in both shoulders and ac joint tenderness.  The rest of her musculoskeletal examination was normal as was her neurological examination.  (Tr. 752-758, 1228-1234).  Alam had an office visit with Dr. Thakkar on March 2, 2015.  She was ambulating with a cane.  She denied seizures. Other than wide based gait and station, her examination was normal.(Tr.

1222-1228).  Alam went to the emergency room at Memorial Hermann Southwest Hospital on

March 11, 2015, complaining of abdominal pain.  (Tr. 653-665, 1740-1754).  Medical records show

that all labs and imaging, including a CT of the abdomen and chest x-ray were normal, as was an

EKG.  Alam went to the emergency room on May 24, 2015, complaining of a cough, sore throat,

mild sinus pressure and ear pain.  Alam reported having the symptoms for two weeks.  Her chest-ray

was normal and after being given a nebulizer treatment she was discharged.  (Tr. 666-671, 1755-

1759).  On August 17, 2015, Alam was transported by ambulance to the emergency room at

Southwest Memorial Hermann Hospital.  (Tr. 672-680).  Alam reported left sided abdominal pain.

Alam's blood pressure measured 240/107. She had a normal range of motion.  While Alam was alert

and oriented, she had "abnormal mood/affect or speech . . . motor deficit noted.  Abnormal reflexes

(exam is complicated by chronic weakness and poor comprehension but pt appears to have only mild

changes in described chronic condition."  (Tr. 676).  A CT of the head showed no acute changes.

Differential diagnoses ranged from "ischemic stroke, spinal cord disease and peripheral

neuropathy...anxiety/hysteria."  Alam was admitted to the hospital for further evaluation.  She was

hospitalized for three days.  (Tr. 681-698, 1760-1786).  Results of a chest x-ray (Tr. 691), CT of the

head (Tr. 693), and CT of the brain (Tr. 698) were all negative.  A CT of the neck revealed scattered

small lymph nodes in the upper neck bilaterally, suspicious of mild inflammatory reaction but

otherwise normal.  (Tr. 695).  A CT of the spine showed: lateral disc herniation on the left at L5-S1

with possible impingement on the exiting L5 nerve root; partial calcification of the annulus at the

L5-S1 level producing mild narrowing in the caudal aspect of the left neural foramen; disc bulge and

ligamentum flavum thickening combine to produce mild narrowing of the central canal at L4-L5.

No acute abnormality was identified.  (Tr. 696).  Alam was diagnosed with malignant hypertension

22

and discharged home.

Alam had a follow up with Dr. Thakkar on August 15, 2015. She denied seizures and was ambulating normally. She had normal gait and station. Alam had a limited range of motion in her left shoulder and tenderness was noted over the left paracervical left trepezial and left paralumbar. (Tr. 1217-1222). On October 19, 2015, Alam was seen by Dr. Thakkar for excessive sneezing, runny nose and stuffy nose. She denied seizures and was ambulating normally. Her examination results were normal. (Tr. 1135-114). She had another office visit with Dr. Thakkar on October 26, 2015, for allergic rhinitis. (Tr. 1130-1135).

Alam's medical records from 2016 show that Alam had an office visit with Dr. Thakkar on January 15, 2016, for a cough. She denied seizures. She ambulated with a cane. The results of her musculoskeletal examination were normal. Her gait and station were wide based. (Tr. 1125-1130). Treatment notes show that Alam had a follow up office visit with Dr. Thakkar on March 14, 2016. She complained of muscle aches, arthralgias/joint pain and back pain. She denied seizures and ambulated normally. Examination results were normal. (Tr. 1118-1125). At Alam's June 1, 2016, office visit with Dr. Thakkar, Alam complained of lower back pain. She denied seizures and was ambulating normally. Her examination results were normal. (Tr. 1112-1118). Alam went to the emergency room at CHI St. Luke's Hospital in Sugar Land on July 10, complaining of back pain. (Tr. 869-899, 1586-1620). Hospital records reveal that Alam's blood pressure was 222/124, and she moaned in pain when changing positions. (Tr. 872). A x-ray of the heel revealed no acute abnormality. (Tr. 878). No neurological abnormalities were noted. Her range of motion was normal. She was diagnosed with flank pain, essential hypertension, and pain of the left heel.

Alam had an office visit with Dr. Thakkar on August 17, 2016. She denied seizures and was

ambulating normally.  The results of the nusculoskeletal and neurological examination were both normal.  (Tr. 1107-1112).  Alam was next seen by Dr. Thakkar on October 10, 2016.  She reported no seizures and was ambulating with a cane.  Her gait and station was wide based.  She had a normal musculoskeletal examination.  (Tr. 1193-1201).  Alam had an office visit with Dr. Thakkar on October 25, 2016.  She complained of a cough.  She denied seizures.  She was ambulating with a cane.  The results of her musculoskeletal examination were normal.  Her gait and station were wide based.  (Tr. 1187-1193).  A chest x-ray revealed that the sternoclavicular joint was normal.  (Tr. 1212).  Alam had an office visit with Dr. Thakkar on December 12, 2016.  Alam complained of left lower extremity pain.  The treatment note reveals that she denied seizures and ambulated with a cane.  She continued to have a wide based gait and station.  She had a normal musculoskeletal examination. (Tr. 1181-1187).

Alam had a office visit with Dr. Thakkar on February 22, 2017.  Alam reported that she had been in Bangladesh and came back sick.  She was ambulating with a cane.  She denied having seizures.  Her gait and station was wide based. The musculoskeletal examination was normal.  Based on the results, Dr. Thakkar diagnosed thoracic back pain.  (Tr. 1175-1181).  Alam's next appointment with Dr. Thakkar was on April 27, 2017, for cervical radiculopathy.  She was ambulating with a cane and denied seizures.  Examination results were the same as prior office visits. (Tr. 1169-1175). A CT of the cervical spine revealed:"[d]egenerative changes involving the cervical spine with osteophytic spurs at C7-T1.  No fracture, dislocation or scoliosis.  Prominent bilateral carotid space lymph nodes; clinical correlation is suggested to exclude lymphadenopathy from lymphoproliferative pathology."  (Tr. 833, 1210).  And a x-ray of the left foot taken that same day showed no fracture, dislocation or lytic or sclerotic lesions.  No radioopaque foreign bodies or soft

24

tissue abnormalities are present at the interphalangeal joints. (Tr. 834, 1211). Alam had an office visit with Dr. Thakkar on May 15, 2017. The treatment note, like most, lists diagnosis and medications. Alam was ambulating with a cane. (Tr. 748-752, 1162-1169). Alam had a CT of the soft tissue of the neck on May 23, 2017. (Tr. 1209). The radiologist opined: "prominent reactive lymph nodes involving the bilateral carotid spaces, submanidubular and submental regions, otherwise unremarkable post-contrast-enhanced CT scan of the neck." Alam had a routine office visit with Dr. Thakkar on August 17, 2017. She was ambulating with a cane and denied seizures. The results of her examination were unchanged. Her blood pressure was elevated. (Tr. 1156-1162). Alam had an office visit with Sreelatha Reddy, M.D., on September 12, 2017, for chronic GERD. (Tr. 1043). She had an consultative evaluation at the Breast Center of Southwest Surgical Associates on September 18, 2017. Dr. Guillermo Ponce de Leon opined there was no indication for surgery and recommended that Alam see a neurologist for an evaluation. (Tr. 1042).

Alam had an office visit with Dr. Thakkar on September 19, 2017. She was ambulating with a cane and indicated that she does not exercise because of lower back pain and chronic vertigo. The treatment note states: "Patient does not follow neurologist for management of seizures as well as history of chronic vertigo." She was complaining about her blood pressure. She reported to recent seizures but "feels she has short timed seizures sometimes." The treatment note reveals she had a limited range of motion in the left shoulder with stiffness and weakness and a wide based gait and waddling. An EKG revealed tachycardia, and she was sent by Dr. Thakkar to the emergency room. (Tr. 1017-1030). She was admitted to Houston Methodist Hospital Sugar Land on September 19, 2017. (Tr. 811-832, 1032-1051, 1374-1514). Alam was "actively seizing when she came in the ED. She displayed muscle stiffening which lasted about 3 minutes. Family states that this appeared

typical of her usual seizures.   Had a colonscopy two days ago and had not been taking her carbamazepine since." A CT of the head showed no acute abnormality.  (Tr. 831).   A MRI brain venogram revealed no evidence of acute venous sinus occlusion.  (Tr. 824).   A MRA of the Circle of Willis revealed no evidence of intracranial flow-limiting stenosis, occulsion, aneurysm or dissection.  (Tr. 825, 1048, 1049).  A MRI of the brain showed mild age-related changes.  Otherwise it was unremarkable.(Tr. 825).  An MRA of the neck was "negative for cervical arterial flow-limiting stenosis, occlusion, dissection, aneurysms, pseudoaneurysms or vascular malformations.  (Tr. 826, 1046, 1047). Alam was diagnosed with accelerated hypertension and seizure disorder.  (Tr. 1387). Alam had an MRI of the lumbar spine on October 17, 2017, which revealed "at L4-5 broad-based left foraminal recess disc protrusion contacts the exited left L4 nerve root.   Broad-based disc protrusion at L5-S1.  Mild Ligamentum flavum hypertrophic changes at other levels."

Alam had an office visit with Dr. Thakkar on October 23, 2017.  It was a follow up for malignant hypertension.  The treatment note shows that she was ambulating with a cane.  Alam's epilepsy was stable.   While the results of her musculoskeletal examination were normal, neurologically, her gait and station was "wide-based and waddling (with poor balance–uses cane)." (Tr. 1011-1015).  Alam had an extracranial carotid evaluation on October 27, 2017.  (Tr. 1044).  The evaluation showed:

> Right: Peak systolic velocities in the right bulb, Internal and carotid arteries are within normal limits.  Antegrade flow is seen in the right vertebral artery.  The right vessel geometry is normal.  The right vertebral waveform is normal.  Evidence of intimal thickening seen.
>
> Left: Peak systolic velocities in the left bulb, internal and external carotid arteries are within normal limits.  Antegrade flow is seen in the left vertebral artery.  The left vessel geometry is normal.  The left vertebral waveform is normal.  Evidence of intimal thickening seen.

A transthoracic echocardiography revealed:

> 1.  Mild concentric left ventricular hypertrophy with normal chamber size and systolic function.  No visualized segmental wall motion abnormalities.  Estimated LVEF is 60%.
> 3.  Trace tricuspid valve regurgitation.
>
> 4.  No evidence of pericardial effusion.
>
> 5.  Normal LV diastolic function profile.

(Tr. 1045).  Dr. Thakkar went over the results with Alam at her October 27, 2017, office visit.  (Tr. 1007-1011).

Records from 2018 show that Alam had an appointment with Dr. Thakkar on February 14, 2018.  She reported no recent breakthrough seizures.  She was ambulating with a cane.  Dr. Thakkar noted tenderness over the right costal cartlidge pin point.  (Tr. 1319-1325).  She returned two weeks later, on February 28, 2018.  Alam reported no recent breakthrough seizures but stated that she feels like she occasionally has short timed seizures.  Her examination results were unchanged from two weeks prior.  (Tr. 1313-1319).  Alam was next seen by Dr. Thakkar on March 23, 2018.  She reported feeling dizzy, experiencing intermittent vertigo, and lower back pain.  The office note indicates that her range of motion was limited due to paralumbar stiffness.  (Tr. 1307-1313).  At Alam's April 30, 2018, office visit with Dr. Thakkar she reported having a break through seizure while having a massage over the right side of her neck. Because of this breakthrough seizure, Dr. Thakkar referred her to a neurologist.  (Tr. 1292-1298). Alam was seen again by Dr. Thakkar on May 15, 2018, for malignant essential hypertension.  The examination results were the same as her prior office visit.  She was ambulating with a cane.  (Tr. 1286-1292).

On May 16, 2018, Alam was seen by Dr. Muhammad Faisal Hafeez Khan, a neurologist.

(Tr. 1572).  Alam stated she had her last seizure on April 19, 2018.  The examination note reflects that Alam's right muscle strength measured 5/5, and the right bicep measured 5/5.  Gait tandem walking was normal. . . there was no fix on either side.  Sensation tests were normal.  An EEG report showed "normal awake and sleep EEG with no evidence of epileptiform." (Tr. 1582).  Based on the EEG report, and examination results, Dr. Khan opined that Alam had localization-related (focal)(partial) symptomatic epilepsy and epileptic syndromes with complex partial seizures, intractable, without status epilepticus and lumbosacral root, disorders probable generalized tonic-clonic seizure, not under optimally controlled with current doses of carbamazepine.

Alam had an office visit with Dr. Thakkar on May 21, 2018.  Her examination results were unchanged and she continued to ambulate with a cane.  Dr. Thakkar opined that her epilepsy was stable.  (Tr. 1280-1286).  That same day, Dr. Thakkar completed a "Multiple Medical Source Statement Questionnaire, that was based on his treatment relationship with Alam since 2007.  (Tr. 1787-1792).  In that Questionnaire, Dr. Thakkar listed Alam's diagnoses and indicated that she has had several seizures in 2018.  Dr. Thakkar also indicated that Alam has pain and fatigue.  Based on her various diagnoses, and pain and fatigue, Dr. Thakkar opined that Alam could sit for one hour, stand/walk for up to an hour, occasionally lift five founds but never more than five pounds.  That she could occasionally carry up to five pounds.  She could never do fingering and lifting but could do moderate grasping, turning and twisting objects. She would need to avoid fumes, humidity, dust, noise, heights, gases, pushing, pulling, stooping, and kneeling.  According to the form, Alam's symptoms would increase in a competitive work environment and that pain and fatigue would affect attention and concentration.  Dr. Thakkar further opined that emotional factors contribute to the severity of Alam's symptoms and that she was incapable of even a low stress job.  Dr. Thakkar

opined that Alam's impairments were not likely to produce good days and bad days.

Alam had an office visit with Dr. Thakkar on June 18, 2018.  The examination results were unchanged.  Alam reported a recent breakthrough seizure.  (Tr. 912-916, 1274-1280).    D  r  . Thakkar completed a form entitled "Seizures Medical Source Statement" on June 18, 2018.  (Tr. 904-907).  According to the form, Dr. Thakkar opined that Alam suffers from convulsive seizures. Dr. Thakkar indicated that Alam has no warning of an impending seizure; she cannot always take safety precautions; and has one every few months.  Dr. Thakkar wrote: "patient will start off with twitching of face then vertigo.  After the dizziness, she will start convulsing with posictal symptoms/confusion."  Dr. Thakkar opined that the seizures last 2 to 5 minutes and afterwards Alam must rest 5 to 6 hours. Dr. Thakkar further opined that stress precipitates the seizures and that Alam is incapable of low stress work.  Likewise exercise may precipitate a seizure.  Dr. Thakkar opined that Alam would sit and stand 2 to 3 hours and could sit and stand/walk for 2 hours, and could lift no weight.  Side effects of Alam's seizure medication include dizziness, lethargy and lack of alertness.  Overall, Dr. Thakkar opined that Alam would need to avoid exertion and potential stressors.  He further opined that Alam would miss more than four days of work a month.

Alam had a follow-up appointment with Dr. Khan on June 26, 2018.  (Tr. 1576-1579).  Dr. Khan prescribed antivert, and continued her other seizure medications and increased her dose of lyrica.  He also prescribed physical therapy.  His diagnosis was unchanged from his initial visit except he added "dizziness and giddiness."

Alam was seen st Foot and Ankle Associates by Sloan Gordon, DPM, on June 21, 2018.  (Tr. 1568-1570).  She was diagnosed with foreign body of foot, hallux valgus, joint pain, limitation of joint movement, and painful gait.

Here, substantial evidence supports the ALJ's step two finding that Alam has the following severe impairments: multilevel spondylosis and mild dextroscoliosis; lumbar radiculopathy; chronic vertigo and sciatica; mild concentric left ventricular hypertrophy, trace mitral valve regurgitation, trace tricuspid valve regurgitation; insomnia; cervical radiculopathy and milod facet joint arthropathy at C7-T1; intervertebral disc disorder of the lumbar region with myelopathy; mild lower lumbar spondylosis, diffuse disc bulging at L4-5 and disc bulging at L5-S1; migraine headaches; mild narrowing of the central canal at L5-S1 and L4-5; and arachnoid granulation of the brain.  Substantial evidence also supports the ALJ's step two finding that Alam has the following non-severe impairments: hypertension and hyperlipidemia, inflammatory polyarthropathy; asthma,; diarrhea; right renal cyst; fatty liver; osteoarthritis of the right knee; small plantar calcaneal spur; subtherapeutic level of carbamazepine; and hallux valgus.  Finally, substantial evidence supports the ALJ's finding that the following impairments were not medically determinable impairments: dizziness; paresthesias of the skin in September 2017; right flank pain, shoulder pain, and gastroesophageal reflux disease; near syncope and palpitations; edema of the lower extremities; probable generalized tonic-clonic seizures; painful gait, joint pain, and foreign body in the foot. Finally, based on the objective medical evidence, as thoroughly discussed by the ALJ in her decision, substantial evidence supports the ALJ's step three determination that none of Alam's impairments met or equaled Section 1.04 or 1.00B2b.  This factor weighs in favor of the ALJ's decision.

**B.  Diagnosis and Expert Opinion**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The Social Security regulations require the Commissioner to evaluate every medical opinion it receives, regardless of its source.  20 C.F.R. §

404.1527(c).  The regulations provide in pertinent part that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R.  § 404.1527(a)(1).  The ALJ has the ultimate responsibility to determine disability status.  *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001).  When good cause is shown, less weight, little weight, or even no weight may be given to a treating physician's opinion.  *Id.*   The Fifth Circuit in *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) held that when a treating physician's opinion about the nature and severity of a claimant's impairment is well-supported and consistent with other substantial evidence, an ALJ must afford it controlling weight.  The Fifth Circuit further instructed that an ALJ has good cause to discounting an opinion on a treating physician where "the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 456.  In such a situation, the ALJ must assess what weight the opinion should be given based on factors enumerated in 20 C.F.R. § 404.1527(c).  Those factors include: (1) the physicians's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; (6) the specialization of the treating physician; and, (7) any other considerations.  *Id.*   These factors need not be considered when there is "competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when "the ALJ weighs treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the

claimant and have specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458.  Simply put: "[t]he Newton court limited its holding to cases where the ALJ rejects the sole relevant medical opinion before it." *Qualls v. Astrue*, 339 F.App's 461, 467 (5th Cir. 2009).  An ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  *Newton,* 209 F.3d at 455.  "The ALJ cannot reject a medical opinion without an explanation." *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Kneeland v. Berryhill,* 850 F.3d 749, 761 (5th Cir. 2017)(ALJ committed error in failing to address examining physician's conflicting opinion thereby making it impossible to know whether the ALJ properly considered and weighed the opinion); *but see Hammond v. Barnhart*, 124 Fed. Appx. 847, 851 (5th Cir. 2005)(failure by ALJ to mention a piece of evidence does not necessarily mean that the ALJ failed to consider it).  Thus the absence of an express statement in the ALJ's written decision does not necessarily amount to reversible error because procedural perfection is administrative proceeds is not required.  *See, e.g., Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012)("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error.").

RFC is what an individual can still do despite her limitations.  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996).  The responsibility for determining a claimant's RFC is with the ALJ.  *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

Alam argues that the Dr. Thakkar's Multiple Impairment Medical Source Statement

Questionnaire completed on May 21, 2018, and was received after the hearing, would have materially changed the outcome had it been presented to the ALJ.  Alam points to Dr. Thakkar's opinion, based on his long term treating relationship with Alam since 2007, that she could only sit for one hour, stand for one hour, and could lift no more than five pounds, and therefore could not work. The Commissioner counters that the form, is outside the relevant time frame by twelve years, and, in any event, the ALJ considered the "Seizures Medical Source Statement" completed by Dr. Thakkar a month later on June 18, 2018,which set forth an even more restrictive RFC.

The law is clear **"while retrospective medical diagnoses may constitute relevant evidence of the onset of disability, they must at least be corroborated by lay evidence relating back to the claimed period of disability." *Luckey v. Astrue*, 458 Fed. Appx. 322, 326 (5th[h] Cir. 2011)(citing *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997).  The Fifth Circuit in *McLendon v. Barnhart*, 184 Fed. Appx. 430, 432 (5th Cir. 2006), further instructed that

> While a retrospective opinion can prove the existence of a disability, the retrospective opinion must refer clearly to the relevant period of disability and not simply express an opinion to the claimant's current status.  Records describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status.

 Here, Dr. Thakkar's May Medical Source Questionnaire points to no contemporaneous treatment notes, and diagnostic studies during to relevant period to support such a restrictive residual functional capacity assessment. While Alam describes Dr. Thakkar's opinion as a retrospective opinion that describes her condition during the insured period, there is no evidence the assessment describes nothing more than her current condition.  The May Medical Source Statement completed years after the date last insured, and which does not refer to any specific treatment records is not persuasive evidence.  Alam's insured status expired in 2006.  She bore the burden of establishing

that she became disabled on or before that date to be eligible for benefits. To the extent that the record contains treatment notes after Plaintiff's last insured date of 2006, those records are relevant only to the extent that they might establish that she was disabled *during the relevant period.* Brown v. Astrue, 344 Fed. Appx. 16, 20-21, (5th Cir. 2009). The records after Alam's DLI do not state opinions or make any findings regarding whether Alam suffered from a disabling condition between 2001 and 2006, nor do they state specifically what Alam's functional limitations were during that period. Rather, the records focus on Plaintiff's condition at the time of those visits, all of which are after the DLI. *See Haywood v. Sullivan*, 888 F.2d 1463, 1472 (5th Cir. 1989)(an evaluation after the ALJ's decision showing a claimant's current functioning does not provide evidence of the claimant's condition during the relevant period). Dr. Thakkar began treating Plaintiff after her insured status ended. And as noted by the ALJ, Dr.Thakkar's contemporaneous treatment notes do not substantially support the limitations listed in Dr. Thakkar's June opinion, and the same is true for the May opinion.

Alam further argues that the ALJ's RFC failed to fully consider the impact of pain on the ability to perform light work when formulating Alam's RFC. According to Plaintiff, spondylosis, dextroscoliosis, lumbar radiculopathy, degenerative disc disease of cervical spine with spurring and facet joint arthropathy, disc disorder of lumbar with myelopathy, lumbar spondylosis, disc bulging, migraine headaches, and narrowing of central cancal at L4-5 are the type of impairments that are know to produce significant levels of pain. The Commissioner counters that the ALJ properly considered Alam's complaints of pain in formulating her RFC and limited her to a reduced range of light work. The ALJ's RFC assessment took into account Alam's non-exertional impairments that were consistent with and corroborated by the record. The objective medical evidence for the relevant

time period shows normal examination results and normal diagnostic test results.

Alam further argues that the ALJ failed to consider the waxing and waning symptoms on her ability to maintain employment when formulating her RFC. According to Alam, because of the nature of her impairments, she has good days and bad days, and was unable to sustain employment between December 31, 2001, and December 31, 2006. The Commissioner maintains that because there is no evidence that Alam has an impairment that waxes and wanes, the ALJ was not required to make an affirmative finding that Alam could maintain employment.

An ALJ is not required to "'make a specific finding regarding the claimant's ability to maintain employment in every case." *See Perez v. Barnhar*t, 415 F.3d 457, 465 (5th Cir. 2005). In Perez, the court wrote that a finding regarding a claimant's ability to sustain employment might be required where the claimant's alleged disability waxed and waned in its manifestation of disabling symptoms, such as where a claimant alleged disability based on degenerative disc disease causing loss of movement in her legs every number of weeks. In certain circumstances, the nature of the impairment and symptoms might require "separate consideration of whether the claimant is capable of maintaining employment." *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003)(citing *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002). Conversely, a claimant's testimony that her back pain caused her to have good days and bad days would not be sufficient to show waxing and waning symptoms. *Id*. The Fifth Circuit has "specifically rejected" the contention that the ALJ "must articulate in every decision a separate and explicit finding that a claimant can maintain a job on a sustained basis." *Castillo v. Barnhart*, 151 Fed. Appx. 334 (5th Cir. 2005), because such a finding is generally implicit in the assessment of the claimant's RFC.

Upon this record, Alam  fails to point to sufficient evidence showing that her impairments

waxed and waned in their manifestation of disabling symptoms in a manner that precluded employment. The record evidence shows that plaintiff's symptoms during the relevant time frame did not wax and wane with the frequency or severity that would compromise her ability to maintain employment for a significant period. *Frank*, 326 F.3d at 619. The record shows that Alam's seizure and resulting hospitalization occurred when she had not taken her medication.

Alam also argues that the ALJ failed to consider the impact of bilateral upper extremity impairments on the ability to perform light work. According to Alam, cervical radiculopathy and degenerative disc disease of the cervical spine with spurring affect the ability to use her upper extremities. The Commissioner responds that the ALJ's RFC assessment accounts for Alam's reduced manual upper dexterity. The ALJ found that Alam could frequently reach overhead to the right and for all other reaching, she could frequently lift to the right, and she could handle items frequently with the right hand. The ALJ noted that Alam had rotator cuff repair surgery and the consultative examiner, Dr. DeVere noted that Alam had mild weakness in the left upper and lower extremities and that she could lift and carry objects with the right hand. The ALJ also pointed to the opinions Dr. Spoor and Dr. Ligon, who both opined that Alam could perform a limited level of light work and performed a function-by-function assessment.

Here, the ALJ evaluated Alam's RFC in accord with SSR 96-8p, 1996 WL 374184, at *3-4 (July 2, 1996), which requires a function-by-function analysis of a disability claimant's ability to perform work related activities. The ALJ's decision shows that the RFC assessment was based in part on the state agency consultants' evaluations, and those evaluations include a function-by-function of Plaintiff's limitations. The Fifth Circuit has held that an ALJ is not required to conduct a function-by-function analysis if she bases her RFC assessment, at least in part, on a state medical

examiner's report that contains a function-by-function analysis. *See, e.g., Beck v. Barnhart*, 205 F.App'x. 207, 213-14 (5th Cir. 2006)(holding that the ALJ's RFC determination was supported by substantial evidence because it was based on an examining physician's "general evaluation" of claimant's mobility, as well as a mon-examining physician's "function-by-function analysis of the impact of [claimant's] impairments on her ability to perform various tasks."); *Onishea v. Barnhart*, No. 03-21028, 2004 WL 1588294, at *2 (5th Cir. July 16, 2004)(holding that the ALJ's reliance on a state examiner's function-by-function analysis is sufficient for the purpose of SSR 96-8p). The ALJ's opinion reflects that she applied the correct legal standards by identifying Plaintiff's functional limitations and assessing her work-related abilities.

Upon this record, the ALJ properly incorporated all the appropriate functional limitations in her RFC to account for Alam's numerous impairments. The ALJ thoroughly discussed the objective medical evidence; Alam's testimony, and the opinion evidence, in formulating Alam's RFC. The ALJ's RFC determination is consistent with the record as a whole. The ALJ, based on the totality of the evidence, concluded that Alam could perform a limited range of light work, and gave specific reasons in support of this determination.

The thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately. The ALJ gave Dr. Thakkar's opinion little weight because his opinion concerning Alam's limitations and inability to work were inconsistent with his own treating records. The ALJ gave some weight to the opinion of Dr. DeVere, and great weight to the opinions of the reviewing physicians, Dr. Spoor and Dr. Ligon. Given the proper discounting of the opinion of Dr. Thakkar, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'"  *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Alam testified that she gets dizzy, faints, and her blood pressure goes up.  (Tr. 54).  Simply put: "I get dizzy and I faint out".  (Tr. 54). When this happens, Alam testified that "I have to grip real tight and slowly I feel cool down."  (Tr. 56).  Alam further testified that she believes the medicine she takes for dizziness causes dizziness along with other prescribed medications such as her blood pressure medicine, and lyrica.  (Tr. 56-57). Alam stated that she has used a cane for the

38

past 18 years, and uses a walker at home.  (Tr. 57-58, 68).  She estimated that she could stand for up to five minutes but would have to hold on to something.  (Tr. 59).  She also has difficulty sitting because of leg spasms.  (Tr. 60).  She also has to use the restroom ten to fifteen times a day.  (Tr. 60-61).  Alam testified that fumes and odors causes her to "panic" because she feels that she cannot breathe.  (Tr. 61-62).  Alam has difficulty laying down because of tightness in her back, and, as a result, does not sleep well.  (Tr. 63).  According to Alam, she injured her rotator cuff in 1999.  Afterwards, she experienced right arm stiffness.  She is also not able to use her left hand.  Because of difficulty with her hands, Alam estimated she could carry three to four pounds.  (Tr. 65).  Alam testified she does not drive because she feels unbalanced.  (Tr. 65).  Alam stated that she could not work from 2001 through 2006 because of seizures, which she had three or four times a month.  (Tr. 67, 70-71, 75-76).  Alam testified that when she rides in a car, she sits in the front passenger seat and looks down at the street.  (Tr. 74).  Alam testified that she has been compliant with taking her medications. (Tr. 76).          The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly.  The ALJ tied his findings to Alam's testimony, and the medical records.    Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

39

The record shows that the ALJ questioned Charles Poor, a vocational expert ("VE"), at the hearing.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at  436.

The ALJ posed  comprehensive hypothetical questions to the VE (Tr. 77-78, 81, 82-83 ), and Alam's attorney likewise questioned the VE.  (Tr.84-89).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. As discussed above, the ALJ's RFC assessment is supported by substantial evidence, and was incorporated in the hypothetical question posed to the VE.   Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Alam was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Alam could perform  work as a photocopy machine operator, laundry classifier, and cashier.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial

evidence to support the ALJ's conclusion that Alam was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Alam was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 10), is  DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 2nd day of September, 2020

Frances H. Stacy
United States Magistrate Judge